706 So.2d 32 (1998)
STATE of Florida, Appellant/Cross-Appellee,
v.
Mary Ann SPIOCH, Appellee/Cross-Appellant.
Nos. 96-1603, 96-1911.
District Court of Appeal of Florida, Fifth District.
January 9, 1998.
Rehearing Denied February 23, 1998.
*33 Robert A. Butterworth, Attorney General, Tallahassee, and Kristen L. Davenport, Assistant Attorney General, Daytona Beach, for Appellant/Cross-Appellee.
Daniel S. Ciener, Andy M. Fouche', Curtis N. Flajole and David J. Romett of Law Firm of Daniel S. Ciener, Merritt Island, for Appellee/Cross-Appellant.
GRIFFIN, Chief Judge.
Mary Ann Spioch was convicted of criminal conspiracy to commit first-degree premeditated murder. The trial court declined to impose a guidelines sentence, instead ordering that Spioch serve fifteen years probation. The state has appealed the downward departure sentence; Spioch has cross-appealed her conviction contending, inter alia, that there was insufficient evidence that she conspired to commit murder.
The background facts show Spioch's son, Thomas, earlier had been convicted of sex offenses against children and was incarcerated in the Brevard County Jail pending hearings on post-trial motions and sentencing. While there he met another inmate, Robert Harley. Harley testified during the conspiracy trial that Thomas approached him and solicited him to kill five people who had participated in Thomas' prosecution. It was agreed that Harley would receive $5,000 for the killings. The names and addresses of the victims were written down on a list and each man was to retain a copy. The conversations between Harley and Thomas Spioch took place over the course of approximately one month. The men agreed that Harley would receive $2,000 up front so that he could bond out of jail and commit the murders, after which he was to contact Thomas Spioch's mother, the appellant here, inform her through the use of a code that the job had been completed, and she was to pay him the balance.
Subsequently, when the initial monies did not arrive, Harley began to complain and Thomas made a phone call to his mother. Harley at that time spoke on the phone with Mary Spioch. The money arrived at the jail three or four days after this phone call. *34 Mary Ann Spioch sent Harley the $2,000 in separate $500 money orders, the sender identified on the money orders was Harley's father. Thomas also arranged for another inmate, Jerrod Bookhardt, to receive a $500 money order, which was supposed to be given to Harley and used by him to bond Bookhardt out as well. That money order was sent in the name of Bookhardt's mother. Harley used the money to bond himself (but not Bookhardt) out of jail, then spent the balance of the money on drugs and parties. Other inmates who were aware of the murder scheme contacted police after Harley's release, and Harley was subsequently arrested in a motel room in Melbourne.
Harley agreed to cooperate against the Spiochs in exchange for a plea to grand theft with a sentence of community control and probation. The Sheriff's department then had Harley place a phone call to Mary Spioch asking for the balance of the money. During this taped telephone conversation, Harley identified himself as a friend of her son from the jail and said that "everything would be taken care of tomorrow." He asked if Mary could "get it to me" and said he wanted to meet with her to pick up the money. He also stated that Thomas had already paid him $2,500, and that Thomas should call him later at a certain phone number. In response, Mary Spioch told Harley she didn't know what he was talking about and said she wasn't going to "get involved in this," but she agreed to pass along Harley's message. Investigators then confronted Mary Spioch at her office and told her they had arrested her son for conspiracy to commit murder. At first she denied ever having had any contact with Robert Harley and said she had no idea what they were talking about. She ultimately admitted to having spoken with Harley and that she had sent money orders to him in the name of his father. She also admitted that she had sent money to Bookhardt. She claimed that she and her son were simply acting out of charity (they "liked to help people out when they could"), and that she knew nothing about a murder plan.
The initial question is whether the state presented sufficient evidence at trial to sustain the conviction of Mary Spioch for conspiracy to commit premeditated murder. The crime of conspiracy consists of an express or implied agreement between two or more persons to commit any criminal offense. § 777.03(3), Fla. Stat. (1995). Herrera v. State, 532 So.2d 54, 58 (Fla. 3d DCA 1988); Velunza v. State, 504 So.2d 780, 782 (Fla. 3d DCA 1987). The existence of an agreement to support a charge of conspiracy may be shown circumstantially. Manner v. State, 387 So.2d 1014 (Fla. 4th DCA 1980). A conspiracy conviction based on circumstantial evidence must be inconsistent with any reasonable hypothesis of innocence. Kocol v. State, 546 So.2d 1159, 1160 (Fla. 5th DCA 1989); LaPolla v. State, 504 So.2d 1353 (Fla. 4th DCA 1987).
These are circumstances the jury had to consider:
1. Thomas Spioch, Mrs. Spioch's son, after he was convicted of the crimes and was awaiting sentence in the Brevard County jail, met Robert Harley, another jail inmate.
2. Thomas offered Harley $5,000 to "take out" some of the investigators and others who caused Thomas problems. Harley agreed to do the "contract."
3. Mrs. Spioch was greatly upset by Thomas' conviction and believed him to have been unfairly convicted.
4. Thomas told Harley that his mother would provide $2,000 up front and the balance when the job was completed.
5. Appellant sent the money to Harley using Harley's father's name and the money to Bookhardt using his mother's name.
6. When the money did not arrive when expected, Harley contacted Thomas and they both talked to Mrs. Spioch by telephone; two days later Mrs. Spioch sent $2,000 to Harley.
7. Concerning final payment, Thomas told Harley that once the murders took place, Harley was to contact Mrs. Spioch and, by the use of a code, inform her that the job was done and he would receive final payment. He was to call her on a cellular phone *35 and tell her to call back from a phone booth. She would then be told where to meet Harley and, upon mentioning the code, Mrs. Spioch would make the final payment.
8. When the police discovered the plot, they had Harley contact Mrs. Spioch and advise her that everything would be "taken care of tomorrow" and could she "get it to me."
9. When the call was placed, Mrs. Spioch denied knowing what Harley was talking about (perhaps because no code was used), and said she did not want to be involved but she agreed to pass along the message.
10. When the police contacted Mrs. Spioch the day after this telephone call, she denied having contact with Harley. She subsequently admitted talking to Harley and sending the money to him using the name of his father to do so.
11. The reason she gave police for sending the money to Harley was that she and Thomas "liked to help people out whenever they could."
These circumstances, which include providing the funds for the offense, conscious acts of concealment and false statements to police, and Mrs. Spioch's explanation that the funding was a philanthropic act were sufficient to meet the burden imposed by State v. Law, 559 So.2d 187 (Fla.1989). Once the state met its initial burden, the weight of that evidence was for the jury.
Mrs. Spioch also contends that the trial court erred in not granting a severance of her case and in continuing her speedy trial period. This issue was not properly preserved below. Further, this is not a constitutional speedy trial case. If Mrs. Spioch is to rely on the rule, she must comply with it. Mrs. Spioch did not pursue her speedy trial remedy under rule 3.191(i), Florida Rules of Criminal Procedures. See Beltran-Lopez v. State, 583 So.2d 1030 (Fla.1991), vacated on other grounds, 505 U.S. 1215, 112 S.Ct. 3021, 120 L.Ed.2d 893 (1992). Even though the court, perhaps without adequate reason, continued her speedy trial period, it may well have reconsidered its decision if it had been confronted with a demand for release under the rule. It may have been trial strategy to sit back and await the jury verdict in the hope of an acquittal and then, only if necessary, urge the remedy provided by the rule. In this way, Mrs. Spioch did not run the risk of having to go to trial, perhaps unprepared, within fifteen days of her demand for release.[1]
As for the state's appeal of Mrs. Spioch's downward departure sentence, we find no error. The trial court gave three reasons for its decision to impose fifteen years of probation rather than four years' incarceration: First, the court found that a downward departure was justified because Mary Ann Spioch required specialized treatment for physical disabilities and was amenable to treatment. § 921.0016(4)(d), Florida Statutes (1995).[2] Mrs. Spioch, who was sixty-three years old, suffered from three major life-threatening conditions: cancer, diabetes and coronary heart disease with hypertension and left ventricle hypertrophy. The cancer required radiation therapy, the diabetes required two insulin injections per day, supplements and special diet. Mrs. Spioch also suffered from depression, requiring medication with Prozac and Ativen. Other medial conditions which required specialized attention periodically were: arthritis, gout, allergic rhinitis, carpal tunnel syndrome, diabetic neuropathy and spinal stenosis.
The state objects on appeal that there is no evidence that Mrs. Spioch could not receive treatment for her physical disabilities while in prison and so a downward departure is inappropriate. Given the nature and extent of her illnesses, however, successful treatment in a prison setting is doubtful. The lower court expressly found that Mrs. Spioch's constellation of medical problems *36 could not be treated as well if she were incarcerated. Moreover, a lack of available treatment in prison is not required under the statute. Although illness is not a "get out of jail free card," a treatable physical disability is one of the circumstances where the legislature has chosen to re-invest trial judges with discretion to vary from sentencing guidelines. The lower court concluded that the statutory basis for a downward departure was met and he was empowered to impose a non-guidelines sentence so that Mrs. Spioch's multiple special treatment needs could be met. There is no basis to reverse this decision.
The court also concluded that Mary Ann Spioch acted under the domination of her son, Thomas. § 921.0016(4)(g). The state takes exception to this finding, arguing the evidence showed that appellant was a knowledgeable business person who was not controlled by her son. She was also, as noted above, sixty-three years old and very ill with multiple maladies. Her son lived with her before going to jail and she was apparently emotionally, if not financially, dependent on him. The record reflects she followed her son's instructions closely. The affidavit of Thomas Spioch states that he "ordered" his mother to send money and told her to "do what I tell [you] to do with my money." Spioch argues that
the trial judge was so convinced that Thomas dominated and controlled the appellee that he ordered her to have no contact with Thomas.
Although the desire to protect a beloved child, no matter how overwhelming, is not the sort of "domination" the statute contemplates, the trial court was in the best position to determine the hierarchy of this mother/son relationship. There are enough psychological factors and other circumstances present to support a finding that Mrs. Spioch acted because she felt she had no choice but to do what her son demanded.
The final reason given for downward departure dealt with the unsophisticated and isolated nature of the offense. The statute requires a showing of remorse, however, which the appellant has not made. At least one reason for departure is valid, however, and will support the downward departure. State v. Chandler, 668 So.2d 1087 (Fla. 1st DCA 1996); § 921.001(6).
AFFIRMED.
COBB and HARRIS, JJ., concur in part; dissent in part, with opinions.
COBB, Judge, concurring in part, dissenting in part.
Mary Ann Spioch was convicted of criminal conspiracy to commit first degree premeditated murder. The trial court declined to impose a guidelines sentence, instead ordering that Spioch serve 15 years probation. The state has appealed the downward departure sentence; Spioch has cross-appealed her conviction contending, inter alia, that there was insufficient evidence that she conspired to commit murder.
The background facts show Spioch's son, Thomas, earlier had been convicted of sex offenses against children and was incarcerated in the Brevard County Jail pending hearings on post-trial motions and sentencing. While there he met another inmate, Robert Harley. Harley testified during the conspiracy trial that Thomas approached him and solicited him to kill five people who had participated in Thomas' prosecution. It was agreed that Harley would receive $5,000 for the killings. The names and addresses of the victims were written down on a list and each man was to retain a copy. The conversations between Harley and Thomas Spioch took place over the course of approximately one month. The men agreed that Harley would receive $2,000 up front so that he could bond out of jail and commit the murders, after which he was to contact Thomas Spioch's mother, the appellant here, and she was to pay him the balance.
Subsequently, when the money did not arrive, Harley complained and Thomas made a phone call to his mother. Harley at that time spoke on the phone with Mary Spioch. The money arrived at the jail three or four days after this phone call. The $2,000 was sent to Harley by Mary Ann Spioch in separate $500 money orders. Since Thomas did not want his mother's name on the them, the money orders were sent in the name of Harley's *37 father. Thomas also arranged for another inmate, Jerrod Bookhardt, to receive a $500.00 money order, which was supposed to be given to Harley and used by him to bond Bookhardt out as well. The money order was sent in the name of Bookhardt's mother. Harley used the money to bond himself (but not Bookhardt) out of jail, then spent the balance of the money on drugs and parties. Other inmates who were aware of the murder scheme contacted police after Harley's release, and Harley was subsequently arrested in a motel room in Melbourne.
Harley agreed to cooperate against the Spiochs in exchange for a plea to grand theft with a sentence of community control and probation. The Sheriff's department then had Harley place a phone call to Mary Spioch asking for the balance of the money. During this taped telephone conversation, Harley identified himself as a friend of her son from the jail and said that "everything would be taken care of tomorrow." He asked if Mary could "get it to me" and said he wanted to meet with her to pick up the money. He also stated that Thomas had already paid him $2,500, and that Thomas should call him later at a certain phone number. In response, Mary Spioch told Harley she didn't know what he was talking about and said she wasn't going to "get involved in this," but she agreed to pass along Harley's message. Investigators then confronted Mary Spioch at her office and told her they had arrested her son for conspiracy to commit murder. At first she denied having had any contact with Robert Harley and said she had no idea what they were talking about. After 10-15 minutes of such denials, however, she admitted to having spoken with Harley and that she had sent money orders to him in the name of his father. She also admitted that she had sent money to Bookhardt. She claimed that she and her son were simply acting out of charity, and that she knew nothing about a murder plan.
The initial question which should be addressed is whether the state presented sufficient evidence at trial to sustain the conviction of Mary Spioch for conspiracy to commit premeditated murder. The law is well settled that the crime of conspiracy consists of an express or implied agreement between two or more persons to commit a criminal offense. Both an agreement and an intention to commit an offense are necessary elements of the crime. Herrera v. State, 532 So.2d 54, 58 (Fla. 3d DCA 1988); Velunza v. State, 504 So.2d 780, 782 (Fla. 3d DCA 1987). Conspiracy may not be inferred from mere aiding and abetting. Velunza, 504 So.2d at 782. While circumstantial evidence alone will support the existence of a conspiracy, Wilder v. State, 587 So.2d 543, 545-547 (Fla. 1st DCA 1991); Edwards v. State, 516 So.2d 285 (Fla. 2d DCA 1987), a special standard of review of the sufficiency of the evidence applies when a conviction is based wholly on circumstantial evidence. State v. Law, 559 So.2d 187, 188 (Fla.1989); Jaramillo v. State, 417 So.2d 257 (Fla.1982). Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with the defendant's reasonable hypothesis of innocence. Law at 188-189. See also Williams v. State, 592 So.2d 737 (Fla. 1st DCA), rev. denied, 601 So.2d 553 (Fla.1992)(evidence that defendant agreed to participate in a "big deal" was not sufficient to support a conviction for conspiracy).
The question then becomes whether the state, in its case in chief, introduced competent substantial evidence which is inconsistent with Mary Spioch's contention that she did not know about any murder plan.
The state readily concedes that it presented no direct testimony that either Harley or Thomas Spioch ever mentioned the crime of murder to Mary Spioch or that she made any reference to that crime at any time to anyone. There was no evidence that she had ever been told the names of the proposed victims. She sent her son's money, at his direction, to Harley and Bookhardt and she did it in a covert manner. Moreover, she initially lied about her contact with Harley, and made an implausible claim that her motives were purely charitable. The state has produced evidence that she knew, or should have known, that she was involved in some wrongdoing at the behest of her son. But what wrongdoing? Why conspiracy to murder rather than conspiracy to bribe a public *38 official or conspiracy to purchase illegal drugs?
The state's star witness, Harley, never testified that Mary Spioch was told about the murder plan or knew anything about the list of proposed victims. In the taped conversation set up by the investigators, she denied any knowledge of the deal between Harley and her son, and expressly declared to Harley that she wanted no involvement with their plans. When the investigators set up the taped telephone conversation between Harley and Mary Spioch, they obviously hoped there would be incriminating statements forthcoming from Mary Spioch. There were notand it simply is not credible that she would pretend to her own coconspirator that she knew nothing of their mutual plan and say she did not want to be involved in it if, in fact, she was part of the conspiracy. There is no evidence whatsoever that she suspected her conversation with Harley was being monitored by investigators. Moreover, Mary Spioch sent money to the jail for Bookhardt as well as for Harley, and there is no evidence and no claim that Bookhardt was involved in any conspiracy to murderif, indeed, there was such a conspiracy.[1]
I would find that the circumstantial evidence presented at trial by the state was insufficient to uphold her conviction of guilt of the crime of conspiracy to commit premeditated murder, and that her motion for judgment of acquittal at the close of the state's case should have been granted.
Although I dissent from the majority's affirmance of Mary Ann Spioch's conviction, I concur with Judge Griffin in respect to the downward departure sentence.
HARRIS, Judge, concurring in part; dissenting in part.
I concur in affirming the conviction. I would, however, reverse the downward departure sentence and remand for a new sentencing.
Conspiring to murder five people is fairly serious stuff. One would think that Mrs. Spioch would be in a world of trouble. Instead the court sentenced her to probation. The trial court gave as its reasons Mrs. Spioch's bad health and the fact that she was under the domination of her son.[1]
The fact that a defendant "requires specialized treatment for ... physical disability, and that the defendant is amenable to treatment" is a proper basis for mitigation. Unquestionably, Mrs. Spioch had serious physical problemsa heart condition and cancer being the most seriousbut is the mere fact of illness sufficient to justify mitigation? Does an ill person automatically have a "get out of jail free" card when he or she commits a crime? Of course not. Does a judge have unlimited discretion to mitigate the sentence of an ill person? If so, this unlimited discretion would be totally inconsistent with the theory of guideline sentences which is to require uniform sentences for similar offenses based on similar circumstances. To be consistent with the principles of uniform sentencing, this mitigating factor should be interpreted so as to have a standard. I believe a standard is implicit in the fact that the requirement of "specialized care" is coupled with the requirement that the "defendant be amenable to treatment." This means that illness alone is insufficient for release unless the defendant is expected to benefit from the release which will permit the specialized care. I submit that this term "specialized care" is not limited to "care by a specialist" but also implies specialized care that is not available within the prison system. And the question should not be whether Mrs. Spioch could get better care outside the prison; the question should be whether she can receive adequate care inside. Otherwise the numerous prisoners who suffer mental or physical ills and who can show that better treatment is available "over the wall" should be released. There is simply no evidence that Mrs. Spioch's health problems cannot be properly handled within the prison environment.
*39 The court's second reason for mitigating her sentence was that Mrs. Spioch was under the domination of her son, doing what he told her to do and feeling she had no choice. While acting under the domination of another is a statutory mitigating factor, the defendant has the burden of proving such domination. Since Mrs. Spioch denied that she did anything at all that was illegal, it is difficult to imagine any record support for a finding that she conspired to murder five people because her son made her do it.[2] Further, since Thomas remained in jail during this entire episode, it is difficult to conceive that he controlled Mrs. Spioch's actions. Since there is no evidence of controleither physical, mental, or emotionalin the record, it is probable that the court found such "control" based merely on the mother/son relationship of the parties. But if a parent acts out of love, compassion, or sympathy for a child, is this acting under the "domination" of the child? For example, can a mother in Florida, apparently unlike Texas, in order to further the interest of her child's cheerleading desires contract for the murder of the mother of her daughter's cheerleader competition and not to go to jail?[3] Again, does a parent who acts illegally for the benefit of or at the request of a child have a "get out of jail free" card? Must there not be some standard in order to meet the principles of guideline sentencing? I believe there must be evidence in the record that Thomas had the ability to rule or control Mrs. Spioch's action and that such domination was exerted in this case on her. There is no record support for this mitigating factor.
I concur in the conviction but would reverse the downward departure sentence and remand for resentencing.
NOTES
[1] We conclude that Spioch's other points lack sufficient merit to warrant discussion.
[2] Section 921.0016(4)(d), Florida Statutes (1995) states:

(d) The defendant requires specialized treatment for addiction, mental disorder, or physical disability, and the defendant is amenable to treatment.
[1] Harley testified at trial that he never had any intention of killing anyone, but was merely conning Thomas Spioch for the money. The law is clear that a conspiracy requires at least two persons who plan and intend to commit a criminal offense. O'Connor v. State, 590 So.2d 1018, 1020 (Fla. 5th DCA 1991).
[1] We all agree that the court's third reason for departing is an invalid reason for departure.
[2] Mrs. Spioch's other son testified that she sent the money to the jail in the manner directed by Thomas because she thought he was in trouble and his life was in danger. Even if so, this would be acting out of compassion or concern but not under the domination of Thomas.
[3] Wanda Holloway, in order to assist her daughter's chances of becoming a cheerleader, contracted (unsuccessfully) for the murder of the mother of her daughter's rival. Although her conviction was set aside because of the improper selection of a juror. See State v. Holloway, 886 S.W.2d 482 (Tex.App. 1st Dist.1994), she subsequently pled no contest to murder solicitation and received 10 years in prison.