787 So.2d 732 (2001)
Donald Lee BRADLEY, Appellant,
v.
STATE of Florida, Appellee.
No. SC93373.
Supreme Court of Florida.
March 1, 2001.
Rehearing Denied June 4, 2001.
*734 Nancy A. Daniels, Public Defender, and Nada M. Carey, Assistant Public Defender, Second Judicial Circuit, Tallahassee, FL, for Appellant.
Robert A. Butterworth, Attorney General, and Stephen R. White, Assistant Attorney General, Tallahassee, FL, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Donald Lee Bradley. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons stated below, we affirm Bradley's convictions and sentence of death.

TRIAL
Bradley was convicted of murder, burglary, and conspiracy, all arising out of the murder of Jack Jones, which was committed at the request of the victim's wife, Linda Jones. Testimony at trial indicated that Mrs. Jones became distraught and incensed when she learned that Mr. Jones had a sexual affair with Carrie Davis, a teenage girl the Joneses had befriended and taken into their home. When unsuccessful in her numerous attempts to break up the affair, and, upon learning of Mr. Jones's intent to marry the girl, Mrs. Jones sought Bradley's assistance, first to physically intimidate the teenage girl and later to assault and batter Mr. Jones.
Bradley had a landscaping business and Mrs. Jones prepared his tax returns. On October 31, 1995, at the request of Mrs. Jones, Bradley took two of his employees, Brian McWhite and Patrick McWhite, teenage brothers, and Michael Clark, a sometime employee, and set out to retrieve a diamond ring Mr. Jones had given his teenage lover. Once they arrived at the teenager's apartment, however, she refused to open the door. Frustrated, Bradley *735 directed the employees to break the teenager's car windows.
Mrs. Jones then decided to have Bradley assault Mr. Jones, and Bradley and Mrs. Jones agreed on a plan to make the assault look like a burglary of the Joneses' house. On November 7, 1995, at about 8 p.m., Bradley picked up the McWhite brothers and, while at the McWhite brothers' house, Bradley directed Patrick McWhite to pick up a large "zulu war stick" to use on Mr. Jones. The McWhite brothers both testified they agreed to help beat Mr. Jones for a hundred dollars each, but that Bradley never mentioned killing Jones. They also testified to numerous telephone conversations Bradley had with Mrs. Jones immediately before and after the home invasion.
As planned, the McWhite brothers, gloved and ski-masked, entered the Joneses' home through the front door, while Bradley entered through a side door in order to obtain a gun Mrs. Jones told him was kept by Mr. Jones in the kitchen. Mr. and Mrs. Jones were watching television, and when Mr. Jones noticed the McWhite brothers, he immediately told them to get out of his home. When they refused, he started fighting with them.
Thereafter, as described by the McWhite brothers, Bradley administered a brutal and methodical beating to Mr. Jones with the "war stick" and the gun. During the beating, Bradley and one of the McWhite brothers duct-taped Mr. Jones's hands and feet and dragged him to another room, and Bradley continued the beating.[1] At one point, Bradley attempted to shoot Mr. Jones in the head, but the gun malfunctioned. Patrick McWhite testified that Mr. Jones continually begged Bradley to stop the beating, while Brian testified that he too asked Bradley to stop, but Bradley refused. Meanwhile, Mrs. Jones calmly watched the whole episode, and Bradley later duct-taped her hands to make it look like she was a victim. The "burglars" also removed some items of personal property from the house. After they left the house Bradley told the McWhite brothers that he thought he killed Jones. Indeed, Jones died as a result of the beating.
After Mrs. Jones called 911 and reported the episode as a burglary and robbery, Brian McWhite's fingerprints were found, leading to the arrest of the McWhite brothers who later confessed to their participation in the events of that night. A neighbor of the Joneses also reported seeing Bradley's van leave the Joneses' home at the time of the alleged burglary. Bradley later admitted that he had made phone calls to Mrs. Jones on the night of the murder but only about picking up some tax documents from under Mrs. Jones's front door and that he went to the Joneses' home, but left immediately when he did not find the tax documents.
Janice Cole, a long-time friend of Mrs. Jones, testified that a few days before the murder, Mrs. Jones had told her of her desire to take a gun and kill her husband and that she, not some other woman, was entitled to the proceeds of Mr. Jones's life insurance policies worth some $500,000. Brian McWhite also testified that Bradley burned the clothing and the "war stick" involved in Jones's beating, and Bradley told him that he was expecting a payoff of between $100,000 to $200,000 from Mrs. Jones after she received the life insurance proceeds.
The McWhite brothers, Bradley, and Mrs. Jones were all charged with the murder. *736 Mrs. Jones was tried, convicted, and sentenced to life imprisonment for the murder. The McWhite brothers entered into a plea arrangement whereby they received ten-year sentences upon guilty pleas to third-degree murder. The plea agreement also required their testimonies in the trials of Mrs. Jones and Bradley. Bradley was convicted of first-degree murder, burglary, and conspiracy to commit murder.

SENTENCING PHASE
At the sentencing phase proceeding, the State presented one witness, and the defense presented fourteen.[2] For the State, Patrick McWhite testified that Mr. Jones was alive throughout the beating and continuously begged Bradley to stop.
The trial judge told the jury of the convictions and sentences of Mrs. Jones and the McWhite brothers. The jury was also told of Mrs. Jones's convictions for two other charges of soliciting others to kill her husband. A police detective testified extensively about Mrs. Jones's solicitations of two other men to kill her husband, including proposing a fake burglary plan for the murder that was almost identical to the fake burglary carried out by Bradley during which he killed Mr. Jones. During one of these solicitations Mrs. Jones asked for a silencer for a gun so she could kill herself and her husband's girlfriend. In another, she proposed that the solicited killer kill her husband and the girlfriend.
The defense presented evidence that Bradley came from a very dysfunctional family and was subjected to extensive emotional and physical abuse. The testimony established that Bradley's father was constantly cheating on his wife with the next-door neighbor, Nancy (no last name provided). As a result, Mr. and Mrs. Bradley were constantly fighting as Bradley and his siblings routinely witnessed their father slapping their mother during these confrontations. Unable to deal with the father's infidelity, the mother eventually left the house and moved into an apartment. Nancy then moved in with the father and the children.[3]
The testimony further revealed that once Nancy moved in, Bradley and his siblings experienced nothing but sheer misery from their father and Nancy. First, the two eldest sisters, Pamela and Cynthia, had to drop out of high school in order to take care of Bradley and the two younger ones since Mr. Bradley and Nancy spent little time with them. The only time spent with Bradley and the siblings consisted mainly of Nancy telling them how much she hated them and the daily beatings by either Nancy or Mr. Bradley upon one or all of them. The beatings could be triggered by a host of events ranging from Nancy telling the father that one of the children was lying to the fact of any of the children drinking or eating before the father got home in the evening. Occasionally, the father would beat them on "general principles," that is, he would *737 beat all of them to ensure that he got the right one or that they already were beaten for the following week. Anticipating the beatings, Bradley and his siblings would cry all night, but as soon as they fell asleep, the father would wake them up and beat them.[4]
To complement the beatings, Nancy and the father would play very odd games with the children. For instance, Cynthia testified that Nancy would mark the milk jug and other food containers before leaving the home so she could tell if any of the children had drunk or eaten anything when she returned; if the food item went below the mark, everyone would get beaten. The father hid dirt in the house before he left and told them they had to find it before he returned; if the dirt was still there, they would all get beaten. Whenever their father and Nancy went out, they would put the children in their room, then place a piece of paper in the door to help them determine whether the children had left their room. They would get a beating for opening the door for any reason, including going to the bathroom, but one of them was beaten for urinating in her room out of fear of dropping the paper off of her room's door.
The testimony also revealed that Bradley received the brunt of the abuse as Nancy and the father took it far beyond the daily beatings. Bradley had broken his arm in some accident and could not move it for days. Nancy, a nurse at the time, and his father refused to take him to the hospital. Because of the pain of the broken arm, Bradley attempted to eat with his left hand but could not and ended up spilling his drink. Nancy then picked up the broken arm, slammed it down on the table and told him the arm was fine. Bradley was finally taken to the hospital after the school threatened to contact the authorities.
In another incident, Bradley was severely suffering from appendicitis, but his father would not take him to the hospital. He eventually took him to Bradley's mother who then immediately took him to the hospital. The hospital treated Bradley and told the mother that Bradley's appendix had ruptured and could have easily killed him. In yet another incident, when Bradley was unable to slice some tomatoes as directed by Nancy, she took the knife out of his hand, stabbed his hand with the knife and asked him, "Now do you know how to cut tomatoes?"
Eventually, after the two older sisters had moved out of the father's home, the latter took Bradley and the two younger siblings and dropped them in front of their mother's one-bedroom apartment. The mother took them in when she got home that evening. Ultimately, Cathy, the eldest sibling, attempted suicide numerous times and Bradley, at the age of fifteen, started frequenting a tough crowd and committing crimes.
Nonetheless, as an adult, Bradley later developed a relationship with his father and helped his mother financially and otherwise. Witnesses also testified to Bradley's intense commitment to his work and family. According to former co-workers and clients, Bradley was an excellent worker. Witnesses testified in great detail about how he took care of his family and was very involved in the lives of his children. On cross-examination, however, Valerie Bradley, his wife, testified that Bradley had been arrested for a battery *738 committed upon her. Bradley also had a long history of being involved as a member of a Jehovah's Witnesses congregation and several times a week attended Bible studies. He made many friends within the congregation.
Upon hearing the above evidence, the jury recommended death by a ten-to-two vote, and, following a Spencer[5] hearing the trial court sentenced Bradley to death.

SUFFICIENCY OF THE EVIDENCE
Bradley raises eight issues for review,[6] first asserting that the evidence was insufficient to support all three of his convictions. As to his murder conviction, he contends the evidence was insufficient to prove premeditated or felony murder.
In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt. See Banks v. State, 732 So.2d 1065, 1067 n. 5 (Fla.1999).
Bradley first asserts a lack of evidence of premeditation. This Court has recently reiterated the definition of premeditation in Woods v. State, 733 So.2d 980, 985 (Fla. 1999):
Premeditation is defined as more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
Id.; see also Buckner v. State, 714 So.2d 384, 387 (Fla.1998) ("Premeditation need only exist for such time as will allow the accused to be conscious of the nature of the act the accused is about to commit and the probable result of the act."). Importantly, however, premeditation may be established by circumstantial evidence. See Norton v. State, 709 So.2d 87, 92 (Fla. 1997). A trier of fact may therefore infer premeditation from factors such as "the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Id.
Upon review of the record, and taking the inferences most favorable to the State, we conclude that the evidence was sufficient to support a finding of premeditation by Bradley. In essence, the State's theory was that Mrs. Jones had two strong motives for wanting to kill her husband, first, her anger about Mr. Jones's affair, *739 and second, her desire to collect the substantial proceeds of Mr. Jones's life insurance policies; and she was able to convince Bradley to kill Mr. Jones to carry out her wishes.
The State's evidence included: the testimony of Janice Cole to whom Mrs. Jones suggested her desire to kill Mr. Jones and to receive his life insurance benefits;[7] the testimony of the McWhite brothers and Clark concerning the October 31 incident in which Bradley attempted to retrieve the ring from the teenager and their subsequent vandalism of the teenager's car that night; phone records showing numerous communications between Bradley and Mrs. Jones on October 31, 1995, November 7, 1995 (the day of the murder), and January 22, 1996 (the day the authorities served a warrant on Bradley); the testimonies of the McWhite brothers of their participation in this act and direct witnessing of Bradley's brutal and fatal beating of Mr. Jones; Bradley's failed attempt at shooting the victim at point-blank range; and the testimony of Brian McWhite regarding Bradley's admission that he was expecting an enormous payoff from Mrs. Jones in a sum ranging from $100,000 to $200,000.
Importantly, we note that the nature of the assault and battery, when combined with the additional evidence of premeditation here, is quite telling. See Heiney v. State, 447 So.2d 210, 214 (Fla.1984) ("Evidence from which premeditation may be inferred include the manner in which the homicide was committed and the nature and manner of the wounds."). Both the testimonies of the McWhite brothers and that of the medical examiner depict a brutal and methodical beating, resulting in profuse bleeding from the victim's head, broken ribs, a fractured skull, and bruising of the victim's brain, lungs, and other internal organs. In the middle of the beating, Bradley and the McWhite brothers taped up the victim's hands and legs, dragged him to another room, and continued the beating. See Taylor v. State, 583 So.2d 323, 329 (Fla.1991) (finding premeditation where defendant dragged the victim and so severely beat him that his ribs were broken and internal organs were either torn or bruised). Despite Bradley's argument to the contrary, this type of beating with its patent consequence of death, along with all the other evidence, is consistent with premeditation. See id.
Bradley contends that the beating only indicates an intent to beat the victim up and scare some sense into him. As the McWhite brothers testified, however, Bradley not only continued to beat the victim to death, but he also attempted to shoot the victim in the head, an act most would agree would ordinarily contemplate death as a consequence. Bradley also points to the testimonies of the McWhite brothers that they themselves believed that they were going there to beat someone up. While it may be true that the *740 McWhite brothers believed so, and were persuaded to participate on that basis, that does not lessen Bradley's responsibility for his own actions in brutally beating the victim to death and attempting to shoot him with his own gun. In addition, he admitted to the McWhite brothers that he indeed was expecting a huge amount of money from Mrs. Jones for his actions, again an expectation reasonably predicated upon Mrs. Jones's receipt of life insurance proceeds that could only come from the death of Mr. Jones.
We find the trial court properly denied Bradley's motion for judgment of acquittal as the State presented sufficient evidence from which the jury could infer premeditation to the exclusion of all other inferences. See Woods, 733 So.2d at 984.[8]

FELONY MURDER
In issue two, Bradley argues that the evidence was insufficient for a finding of felony murder. Specifically, the felony murder in this case was predicated upon Bradley's conviction for the burglary of the Joneses' home. Bradley contends that the burglary conviction was improper because he entered the home with the consent of a co-owner and co-occupant, Mrs. Jones. Consequently, the burglary conviction must be reversed. The State, on the other hand, counters this issue was not properly preserved and therefore Bradley may not now raise it on appeal. We agree with the State inasmuch as the record reveals that Bradley had many opportunities at trial to object to the submission of the burglary issue but failed to do so. Bradley is therefore barred from raising this issue now.[9]

CONSPIRACY
In issue four, much as in issue one, Bradley argues the State failed to establish beyond a reasonable doubt that Bradley and Mrs. Jones conspired to kill Mr. Jones. Therefore, he contends, his conviction for conspiracy must be vacated.
The crime of conspiracy is defined as an agreement, express or implied, between two or more people to commit an unlawful act. See Robinson v. State, 610 So.2d 1288 (Fla.1992); see generally § 777.03(3), Fla. Stat. (1995) (conspiracy statute); § 782.04, Fla. Stat. (1995) (murder statute). Conspiracy can be proven by circumstantial evidence and thus a jury may infer that an agreement existed to commit a crime from all the surrounding and accompanying circumstances. See Robinson, 610 So.2d at 1289.
As earlier discussed, sufficient evidence exists for the finding of premeditation on Bradley's part for the killing of Mr. Jones. Similarly, we conclude the evidence is sufficient for the finding of conspiracy, that is, an agreement between Mrs. Jones and Bradley to kill Mr. Jones. As previously discussed and established by Janice Cole's testimony, Mrs. Jones's frustration with her husband's affair had reached a boiling point in the days leading to the murder, and she wanted him killed perhaps more than ever. In addition to this testimony and the evidence of coordination between Bradley and Mrs. Jones *741 around the time of the murder, Bradley himself, in an attempt to convince the McWhite brothers to keep quiet, told them that he was expecting a payoff from Mrs. Jones as soon as she collected from the insurance companies.
In light of these circumstances, Bradley's hypothesis of innocence with regard to conspiracy to murder Mr. Jones is not reasonable here. See State v. Spioch, 706 So.2d 32, 34-35 (Fla. 5th DCA 1998) (circumstantial evidence standard was met where evidence of motive, payment to the coconspirator, and unsatisfactory explanation for the payment was introduced).

WILLIAMS-RULE EVIDENCE
In issue five, Bradley argues that evidence of the October 31 incident was improperly presented at trial as Williams rule evidence because the sole purpose of the evidence was to show his bad character and propensity to commit crimes. We disagree.
This Court, in Zack v. State, 753 So.2d 9 (Fla.), cert. denied, 531 U.S. 858, 121 S.Ct. 143, 148 L.Ed.2d 94 (2000), has recently and extensively addressed the standard for admitting evidence as follows:
In Williams v. State, 110 So.2d 654 (Fla.1959), this Court reiterated the standard rule for admission of evidence; that is, that any evidence relevant to prove a material fact at issue is admissible unless precluded by a specific rule of exclusion. See § 90.402, Fla. Stat. (1995). The Court also said relevant evidence will not be excluded merely because it relates to facts that point to the commission of a separate crime, but added the caveat that "the question of the relevancy of this type of evidence should be cautiously scrutinized before it is determined to be admissible." 110 So.2d at 662. This rule concerning the admissibility of similar fact evidence has been codified by the Legislature as section 90.404(2), Florida Statutes (1995).
Later, in Bryan v. State, 533 So.2d 744 (Fla.1988), we made it clear that the admissibility of other crimes evidence is not limited to crimes with similar facts. We stated that similar fact evidence may be admissible pursuant to section 90.404, and other crimes or bad acts that are not similar may be admissible under section 90.402. We reiterated the distinction between "similar fact" evidence and "dissimilar fact" evidence in Sexton v. State, 697 So.2d 833, 837 (Fla.1997).
Thus, section 90.404 is a special limitation governing the admissibility of similar fact evidence. But if evidence of a defendant's collateral bad acts bears no logical resemblance to the crime for which the defendant is being tried, then section 90.404(2)(a) does not apply and the general rule in section 90.402 controls. A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion. Heath v. State, 648 So.2d 660, 664 (Fla.1994).
Thus, whether the evidence of other bad acts complained of by Zack is termed "similar fact" evidence or "dissimilar fact" evidence, its admissibility is determined by its relevancy. The trial court must utilize a balancing test to determine if the probative value of this relevant evidence is outweighed by its prejudicial effect. See § 90.403, Fla. Stat. (1995); Gore v. State, 719 So.2d 1197 (Fla.1998).
Id. at 16.
At trial, the State was permitted to introduce evidence that on the night of October 31, 1995, one week before Mr. Jones was killed, Bradley, the McWhite brothers and Clark vandalized the car of Mr. Jones's teenage girlfriend. The McWhite *742 brothers, Clark, and the girl testified about the incident, in which Bradley, the McWhites, and Clark drove to her apartment to intimidate her and to retrieve the ring Mr. Jones had given her. Since Mr. Jones was at the apartment, the men waited for his departure. When Mr. Jones left, the four men knocked on the door, but the girl refused to answer it. The McWhite brothers then broke her vehicle's windows, as directed by Bradley. For a good part of this episode, according to the testimony, Bradley was in constant communication with Mrs. Jones through his cellular phone.
In Foster v. State, 679 So.2d 747 (Fla. 1996), the Court rejected a similar claim. At Foster's trial for two counts of murder, the State introduced collateral crime evidence that, on the day of the killings, Foster had earlier robbed three other individuals. See id. at 753. On appeal of his convictions, Foster argued, much as Bradley presently does, that the trial court erred in admitting this evidence because it was presented solely to establish his bad character. See id. The Court affirmed the convictions and held that the evidence was relevant to show Foster's motive and ultimately his intent. See id. ("These robberies were all committed in an attempt to recoup Booker's [accomplice] gambling losses.").
Though different in other respects, Foster is analogous to the current case on this issue. Much as in Foster, 679 So.2d at 753, where the State was trying to show intent and motive, the State here was attempting to establish Bradley's intent and premeditation, a material point at trial. In order to prove the premeditation element, the State had to establish the chain of events which tended to show Mrs. Jones's initial procurement of Bradley to break up her husband's romantic relationship and her subsequent conspiracy with Bradley to kill Mr. Jones. As to Bradley's argument that the October incident did not involve the victim of the murder and thus should not have been admitted, we note that the victims of the robbery in Foster were different from the eventual murder victims as well. See 679 So.2d at 750-51. Yet, the evidence was found to have been properly admitted there. See id. at 753.
As this Court stated in Zack, it is permissible to introduce evidence which helps put the entire case in perspective to the extent, of course, that its relevance is not substantially outweighed by its prejudicial effect. See 753 So.2d at 17. Here, the October 31 incident provides the necessary coherence to the State's theory that Bradley had become the enforcer of Mrs. Jones's angry wishes, which ultimately included murdering her husband for his participation in an extramarital affair. See State v. Richardson, 621 So.2d 752, 755 (Fla. 5th DCA 1993) ("Evidence of collateral crimes may be admissible to establish the entire context out of which the alleged criminal conduct arose."). Therefore, the evidence was relevant to developing the circumstances leading up to the murder, regardless of whether it is termed similar or dissimilar evidence. See Coolen v. State, 696 So.2d 738, 742-43 (Fla.1997) (evidence of knife threat to victim's son was relevant to show defendant's state of mind on the night of the murder); Ferrell v. State, 686 So.2d 1324, 1328-29 (Fla.1996) (evidence of robbery was properly admitted to complete the story of the crime on trial and to explain defendant's motivation in seeking to prevent retaliation by the victim).[10]

*743 PRIOR CONSISTENT STATEMENTS
In issue six, Bradley argues that the trial court erred in admitting an out-of-court statement as a prior consistent statement. We agree with Bradley on this issue but find the error harmless.
It is well established that prior consistent statements are generally not admissible to bolster a witness's testimony at trial. See Chandler v. State, 702 So.2d 186, 197 (Fla.1997). In order to be admissible, prior consistent statements, like any other hearsay statements, must qualify under a hearsay exception. See id. Otherwise, prior consistent statements can be admitted as nonhearsay "if the following conditions are met: the person who made the prior consistent statement testifies at trial and is subject to cross-examination concerning that statement; and the statement is offered to `rebut an express or implied charge ... of improper influence, motive, or recent fabrication.'" Id. at 197-98; see also § 90.801(2)(b), Fla. Stat. (1995).
The trial court allowed Detective Steve Leary to testify about a statement made to him by Detective Redmond regarding whether Bradley had gotten his car cleaned prior to the car being seized and processed for blood evidence. Specifically, Detective Leary testified that Detective Redmond told him that Bradley's van had been detailed prior to the seizure of the van by the police. The trial court allowed the testimony as a prior consistent statement of Detective Waugh that Bradley had told him on a January 22 taped interview that he had detailed his van four or five times since the time of the killing.
We conclude that the trial court erred in allowing this testimony. At the outset, it is questionable whether defense counsel's cross-examination of Detective Waugh was an insinuation of recent fabrication. He merely asked the detective why Bradley's statement relating to the van being detailed was not on the tape like the rest of the interview. At no point did he charge the detective with having recently fabricated the story about the detailing of the van. Compare Foburg v. State, 744 So.2d 1175 (Fla. 2d DCA 1999) (finding error in trial court's ruling allowing prior consistent statement where defense counsel did not allege or imply that witness had a motive to falsify), and Keffer v. State, 687 So.2d 256, 258 (Fla. 2d DCA 1996) (same), with Rodriguez v. State, 609 So.2d 493, 499 (Fla.1992) (finding no error in allowing taped testimony to rebut inference of improper motive to fabricate), and Chandler, 702 So.2d at 188 (finding no error in allowing prior consistent statement of defendant's daughter as rebuttal of suggestion of more recent fabrication).
However, even assuming that defense counsel had in fact insinuated a recent fabrication by Detective Waugh, Chandler's first condition was not satisfied. Here, Detective Leary testified to a statement made to him by Detective Redmond, not Detective Waugh. However, Detective Redmond, the declarant, did not testify and was not available for cross-examination. Thus, the statement should not have been admitted because it remained classic hearsay which fell under no recognized exception. See Chandler, 702 So.2d at 197.
Nevertheless, harmless error analysis governs the improper admission of prior consistent statements. See id. Given that Detective Waugh had in fact testified that Bradley told him that the van *744 had been detailed, Detective Leary's testimony was merely cumulative to that testimony. When we combine this with the abundant evidence of Bradley's guilt, we conclude the trial court's error was harmless. See Moore v. State, 701 So.2d 545, 550 (Fla.1997) ("Because there was direct evidence from other witnesses that Moore possessed a gun on the actual day of the murder and direct evidence that Moore shot the victim, there is no reasonable possibility that the error contributed to the conviction here.").

PENALTY PHASE
In issue seven, Bradley argues that the trial court erred during the penalty phase of the case in instructing the jury on and in finding the aggravating circumstance that the crime was committed in a cold, calculated, and premeditated manner (CCP).[11] This Court has held that in order to establish the CCP aggravator:
[T]he jury must first determine that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated); and that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Woods v. State, 733 So.2d 980, 991 (Fla. 1999) (quoting Gordon v. State, 704 So.2d 107, 114 (Fla.1997)). This aggravator is of a particularly higher degree and gravity than the premeditation element required to prove first-degree murder. See Jackson v. State, 648 So.2d 85, 89 (Fla.1994).
Upon review of the evidence we find sufficient competent substantial evidence to allow the issue to go to the jury and supporting the finding of the CCP aggravator. As mentioned earlier, the McWhite brothers' testimonies and other evidence strongly point to a carefully arranged plan between Mrs. Jones and Bradley to kill Mr. Jones. Indeed, there was evidence that Mrs. Jones had unsuccessfully sought to hire another person to kill her husband in the exact manner that Bradley later, in fact, did kill Mr. Jones. Pursuant to her plan with Bradley, Mrs. Jones made sure to have both her front and side doors unlocked to allow Bradley and the McWhite brothers to enter the home that night. Bradley and the McWhite brothers even knew which path to take in order to avoid the motion-detector lights. As arranged by Mrs. Jones, Bradley also knew exactly where to find Mr. Jones's gun. He also told the McWhite brothers to bring the stick with which to beat the victim.[12]
Bradley also argues that there can be no CCP since he only intended to beat Mr. Jones. Once again, as discussed earlier, the brutal and methodical nature of the beating itself and the additional use of a gun indicates an intent to kill. See Heiney, 447 So.2d at 214. It seems that if Bradley only intended to intimidate the victim, that could have been accomplished well before he landed the fatal blows to the head or attempted to shoot the victim point-blank. He could have stopped, for instance, after the first round of the beating when he tied the victim's hands and *745 legs. Additionally, after the murder he told one of the McWhite brothers that he was expecting between $100,000 and $200,000 from Mrs. Jones. This seems to be an inordinately huge amount of money for a simple beating. Thus, this theory does not seem to be reasonable with regard to CCP.[13]
We conclude that these circumstances considered together support the finding of CCP. See Bell v. State, 699 So.2d 674, 677 (Fla.1997) ("Cold, calculated, premeditated murder can be indicated by the circumstances showing such facts as advance procurement of a weapon, lack of resistance or provocation, and the appearance of a killing carried out as a matter of course.") (citing Swafford v. State, 533 So.2d 270, 277 (Fla.1988)).

PROPORTIONALITY
In issue eight, Bradley challenges the proportionality of his death sentence. Due to the uniqueness and the finality of death, this Court addresses the propriety of all death sentences in a proportionality review. See Porter v. State, 564 So.2d 1060, 1064 (Fla.1990). In conducting this review, this Court makes a comprehensive analysis in which it determines whether the crime falls within the category of both the most aggravated and the least mitigated of murders, see Cooper v. State, 739 So.2d 82, 85 (Fla.1999), thereby providing for uniformity in the application of the sentence. See Urbin v. State, 714 So.2d 411, 416-17 (Fla.1998). Proportionality review, however, is more than a mere quantitative comparison between the number of aggravating and mitigating circumstances. See Bates v. State, 750 So.2d 6 (Fla.1999), cert. denied, 531 U.S. 835, 121 S.Ct. 93, 148 L.Ed.2d 53 (2000). Rather, it is a review of the totality of all the circumstances in a case as compared to other cases in which the death penalty had been imposed. See Robinson v. State, 761 So.2d 269 (Fla.1999), cert. denied, 529 U.S. 1057, 120 S.Ct. 1563, 146 L.Ed.2d 466 (2000).
The court here found four aggravating circumstances: (1) the capital felony was especially heinous, atrocious or cruel (HAC);[14] (2) CCP;[15] (3) the capital felony was committed for pecuniary gain;[16] and (4) the capital felony was committed while engaged in the commission of the crime of burglary.[17] As to the statutory mitigating circumstances, the court found but gave very little weight to the two statutory mitigating circumstances: (1) the defendant had no significant history of prior criminal activity; and (2) the age of the defendant at the time of the crime (thirty-six). The trial court also found and gave "some weight" to certain nonstatutory mitigating circumstances: Bradley overcame a chaotic childhood and dysfunctional family life to make real achievements in his own life, including establishing loving relationships in his family and reestablishing a relationship with his father; he had been a good provider and father for his present wife and his children, loves his family, and is *746 loved by them; he has maintained a good employment record; he was helpful to other people inside and outside of his family; and he has shown sincere religious faith.
We conclude that the death sentence in this case is proportionate to those other cases involving many similar circumstances where we have approved death. See McDonald v. State, 743 So.2d 501, 507 (Fla.1999) (affirming the death sentence where evidence established four aggravating circumstances of commission during a robbery/burglary, HAC, CCP, and pecuniary gain, and three nonstatutory mitigators of the defendant's good prison behavior, his advanced age at the time of eligibility for parole, and codefendant's lighter life sentence); Gordon v. State, 704 So.2d 107, 117 (Fla.1997) (finding sentence proportionate where evidence established four aggravating circumstances of commission during a burglary, pecuniary gain, HAC, and CCP, and very little in mitigation). We have even affirmed death sentences in other cases with less aggravation than the current case. See Sliney v. State, 699 So.2d 662 (Fla.1997) (finding the death penalty proportionate with the existence of two aggravating circumstances of commission during a robbery and to avoid arrest, two statutory mitigators (age and lack of criminal history), and a number of nonstatutory mitigators); Hayes v. State, 581 So.2d 121 (Fla.1991) (affirming the death penalty where evidence established two aggravating circumstances of CCP and commission during a robbery, one statutory mitigator (age), and other nonstatutory mitigators).
Bradley's main contention is that the lighter sentence of Mrs. Jones renders his sentence disproportionate. This Court has held on numerous occasions that the relative culpability of a codefendant and the sentence imposed on such codefendant are appropriate and important factors in considering whether to impose or approve a death sentence. See, e.g., Howell v. State, 707 So.2d 674, 682 (Fla.1998). However, this Court has also found with some limited exceptions that the defendant who actually plans and kills the victim is charged with a high level of culpability and his codefendants' lesser sentences will not necessarily render his death sentence disproportionate. See Sliney v. State, 699 So.2d 662, 672 (Fla.1997).
We agree that the record reveals that Mrs. Jones did in fact plan this murder and was the originator of the idea of killing her husband. That is evidenced by the fact that she had contacted two other individuals to commit this murder. However, the evidence is also consistent with some level of participation in this planning on Bradley's part as well, as shown by the evidence of premeditation and conspiracy between the two. The record also establishes that Bradley, with the help of the McWhite brothers and not Mrs. Jones, actually carried out this brutal beating of the victim.
We acknowledge evidence that Mrs. Jones initiated the scheme to kill and sat and watched approvingly. However, in addition to Bradley's culpability as the actual killer and his participation in the planning, a review of Mrs. Jones's penalty phase proceeding also distinguishes her case from Bradley's and reveals possible reasons why her life was spared. In Mrs. Jones's case, though the State sought and argued for death, the State only asserted the existence of two aggravators (pecuniary gain and CCP). In addition, defense counsel argued that Mrs. Jones was under extreme emotional pressure because of the betrayal by her husband and by his teenage lover, who, despite being treated like a daughter by Mrs. Jones, proceeded to betray this kindness by having an affair with Mr. Jones. Counsel also highlighted Mr. *747 Jones's blatant disrespect for his wife in flaunting his affair, which, he argued, also contributed to Mrs. Jones's emotional breakdown. That argument may well have resonated with the jury, resulting in a life recommendation for Mrs. Jones.
In contrast to this evidence of mental mitigation for Mrs. Jones, the evidence reveals no such emotional investment and subsequent emotional devastation on the part of Bradley. Rather, Bradley seems to have strictly been motivated by an expected monetary payoff. Considering all these circumstances, we conclude the sentence is not disproportionate. See McDonald, 743 So.2d at 506-07 (finding that codefendant's life sentence did not render death sentence disproportionate where codefendant hired defendant to kill her husband); Gordon, 704 So.2d at 117 (same).
Accordingly, for the reasons stated above, we affirm Bradley's convictions and death sentence.
It is so ordered.
WELLS, C.J., and SHAW, HARDING, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] At one point, Patrick, who thought that Mr. Jones had been beaten enough and wanted to tie Mr. Jones's hands as directed by Bradley, begged Mr. Jones, "Please, give me your hand, sir."
[2] The witnesses presented by Bradley included Detective Waugh, Donald Lee Bradley, Sr., Julie J. Witherell (Bradley's mother), Valerie Bradley (Bradley's wife), Cynthia Lee Bradley (Bradley's sister), Cathy M. Robbins (Bradley's sister), Pamela J. Bradley (Bradley's sister), Arthur J. Kurtz (a former employer), Elizabeth Smith (a former business acquaintance), Katisha Gussman (Bradley's niece), Mark Angelo (a business acquaintance and general contractor), Eli F. Robbins (Bradley's ex-brother-in-law), Harvey G. Sowers (a fellow church member), and Dean Lohse (Bradley's orthopedic surgeon).
[3] The Bradleys had five children, Pamela, Cynthia, Donald, Cathy, and Collins. Bradley was somewhere between ten and eleven years old at the time.
[4] Cynthia further testified that their father made them lean over a clothes hamper and grab the bottom of it while he beat them, usually with leather belts, but sometimes with a "switch" he made them pick themselves. She also testified to various marks and scars left by the beatings all over their bodies.
[5] Spencer v. State, 615 So.2d 688 (Fla.1993).
[6] The issues raised by Bradley include: (1) the evidence was insufficient to support Bradley's conviction for premeditated first-degree murder because there was conflicting evidence regarding his intent to kill; (2) the evidence was insufficient to support his conviction for felony-murder (burglary) because he was allowed entry into the home by one of the occupants; (3) even assuming the finding of premeditation, he is entitled to a new trial because the jury may have convicted him on a legally insufficient theory (felony murder/burglary); (4) the evidence was insufficient to prove conspiracy to commit first-degree murder; (5) the trial court erred in admitting evidence that Bradley vandalized Carrie Davis's car on October 31, 1995, where such evidence was not relevant to any material issue and served only to attack his character; (6) the trial court erred in admitting an out-of-court statement by Detective Redmond to the effect that Bradley's van had been detailed five times since the murder; (7) the trial court erred in instructing the jury on and in finding the CCP aggravator; (8) the sentence was disproportionate and the trial court erred in instructing the jury on and in finding the burglary aggravator.
[7] The relevant examination of Ms. Cole reflects:

Q. What did she [Ms. Jones] tell you?
A. She told me that she was real upset with the situation and everything that she had been through. That she knew at this point that she could just take a gun and kill Jack and get away with it because of the issues that had come up and she was so upset with him.
. . . .
Q. Okay. Did she give you any other reason why she could not get a divorce with Jack?
A. She said that if she got a divorce from Jack that his new wife would get his life insurance. And she told me, and I thought that the figure was $500,000 at the time, if they got a divorce that she would not be able to get that life insurance. And that was one of the main things, that she was not going to fat and forty and alone.
Record on Appeal at 1434-36.
[8] It should be noted that Bradley's position at trial was that he did not commit the crime, but was at his home watching television instead.
[9] In issue three, Bradley argues that his conviction for murder must be reversed should the Court find that the verdict may have been based on a legally insufficient ground. We need not address this issue as we have found that Bradley is barred from challenging his burglary conviction on direct appeal, in addition to our finding that the jury properly found the existence of premeditation on Bradley's part.
[10] Bradley also argues that the fact that the judge did not allow evidence of Mrs. Jones's solicitation of two other individuals to kill Mr. Jones demonstrates that the October 31 incident was improperly admitted. This argument, however, fails to recognize that Mrs. Jones's solicitation of these two other individuals occurred well before Bradley came on the scene. Therefore, it would not have been appropriate to admit this evidence since Bradley was in no way involved at that time.
[11] See § 921.141(5)(i), Fla. Stat. (1995).
[12] Brian McWhite testified that when Bradley told him to pick up the stick, he subsequently told him that they might not need it after all. The jury could have reasonably inferred that Bradley made the latter statement because he knew that he was going to find Mr. Jones's gun in the kitchen, as arranged by Mrs. Jones.
[13] Bradley also argues that there is a possibility that Mr. Jones did not die immediately and Mrs. Jones finished him off after Bradley left. The only evidence he provided in support of this contention is that there is some indication that Mrs. Jones took a shower after Bradley left her home. He also contends that Mr. Jones had a head injury which was not consistent with the impact of the stick. The jury properly rejected this hypothesis. See Woods, 733 So.2d at 986.
[14] See § 921.141(5)(h), Fla. Stat. (1995).
[15] See supra pp. 744-46.
[16] See § 921.141(5)(f), Fla. Stat. (1995).
[17] See § 921.141(5)(d), Fla. Stat. (1995). Bradley argues that this aggravator does not exist. As addressed in issue two, see supra p. 740, we find otherwise.