PER CURIAM.
This case is before the Court on appeal from a judgment of conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const.
BACKGROUND
Johnny Mack Sketo Calhoun and Mia Chay Brown were both reported missing on December 17, 2010. On December 20, Brown’s remains were found bound and burnt in her car, which had been lit on fire in the woods of Alabama. Calhoun, thought to be the last person to see Brown alive, was found hiding in the frame of his bed inside his trailer on December 20.
Guilt Phase
Brown worked at Charlie’s deli and grocery store in Esto, Florida. Harvey Glenn Bush saw Brown working at Charlie’s deli around 1 to 1:30 p.m. on December 16, 2010, and knew Brown drove a white car. Bush heard Calhoun ask Brown for a ride that evening and Brown responded that *355 she would pick him up after work at approximately 8 to 9 p.m.
Brown drove to Jerry Gammons’ trailer in a light colored, four-door car and knocked on his door at about 8:40 p.m. on December 16. Brown asked for Calhoun, and Gammons told her that Calhoun did not live there. America’s Precious Metals junkyard, where Calhoun’s trailer was located, is approximately one road down from Gammons’ trailer.
Brandon Brown, Brown’s husband, talked with Brown at lunch time on December 16 while she was working at Charlie’s deli. Brown usually got off of work at approximately 9 p.m. Brandon called Brown at 10 p.m. because she was not home. Brandon fell asleep on the couch at about 10:80 p.m., and when he woke up at 2 a.m., his wife was still not home. It was unusual for Brown not to come home; Brandon started calling family members to find her.
Sherry Bradley, the manager at Gladstone’s convenience store located between Enterprise and Hartford, Alabama, testified that Calhoun came into her store between 5:80 and 6:00 a.m. on December 17, 2010, and bought cigarettes. Bradley noticed scratches and dried blood on his hands and sores on his face. Calhoun was wearing a white shirt that had spots of blood on it and there was something black underneath his fingernails. She asked Calhoun about his appearance, and he responded that he had been deer hunting. Calhoun was driving a white, four-door car with a Florida license plate. Darren Bratchelor, a former schoolmate of Calhoun’s, also saw Calhoun at the convenience store at about 6 a.m. After that day, Bradley left town for a few days, but when she returned, another employee had posted a missing persons flyer in the store, on which she recognized Calhoun’s photograph.
Chuck White, a patrol officer for Holmes County, Florida, arrived at America’s Precious Metals at 8 a.m. on December 17. White looked in Calhoun’s trailer and found clothes and trash scattered everywhere. Calhoun was not there. On cross-examination, White testified that Sketo Calhoun (“Sketo”) and Terry Ellenburg, co-owners of America’s Precious Metals, told him that there had been a break-in at the junkyard, that there were pry marks on Calhoun’s trailer door, and that the skid steer loader, or Bobcat, had been hot-wired and moved. White noticed many tire tracks around the yard. White acknowledged that he did not secure Calhoun’s trailer before he left the yard.
Brett Bennett, a cattle broker in Geneva, Alabama, noticed smoke from the highway on December 17 at approximately 11 a.m. Keith Brinley, a school maintenance employee in Geneva, Alabama, also saw a big fire behind the Bennett residence at about that same time.
Tiffany Brooks, a resident of Hartford, Alabama, found Calhoun in her family’s shed on the morning of December 18, 2010. Calhoun was on the ground wrapped in sleeping bags that the family kept around the freezer. Calhoun was wearing overalls and a white t-shirt and was wet and dirty. Brooks brought Calhoun into the house and the family washed his clothes, gave him new clothes, let him shower and nap, and gave him some food. Steven Bledshoe, Tiffany’s boyfriend, called the Brooks’ residence and told them about the missing persons flyer he saw with Calhoun and Brown’s pictures on it. Calhoun told the Brooks he did not know Brown but she was probably the person who was supposed to pick him up at his trailer the night before. Calhoun had the Brooks drop him off at a dirt road. Glenda Brooks, Tiffany’s mother, also testified to these events.
*356 Brittany Mixon, Calhoun’s ex-girlfriend, testified that she went to school with Brown and that Brown knew Calhoun through her and from working at the convenience store. On December 16, Mixon stayed at her father’s house and expected Calhoun to come over that night but he never came. Mixon drove to America’s Precious Metals on the morning of December 17 to find Calhoun because he did not have a phone to call. Mixon used to live in Calhoun’s trailer with him but moved out in October of that year. She testified that they had lost the key to the trailer so they had had to pry the door open to get inside the trailer. Mixon asked Sketo if he had seen Calhoun, but he had not. Mixon looked inside Calhoun’s trailer; no one was inside, but the trailer was ransacked. Lieutenant Michael Raley of the Holmes County Sheriffs Office investigated Brown’s missing persons report. He called Mixon, who told Raley about a campsite in Hartford, Alabama, approximately ten miles from America’s Precious Metals, where Mixon and Calhoun would camp. The campground was on the property of Charlie Skinnard, Calhoun’s brother-in-law. Mixon met the Brooks family once while camping with Calhoun. She took Raley to the campsite. Raley noted that the burnt car was off of Coleman Road, approximately 1,488 feet away from Calhoun’s campsite. The Brooks’ residence was approximately 1.5 miles from the burnt car.
Angie Curry, Priscilla Strickland, and Mixon went to Calhoun’s trailer around 4 p.m. on December 17. Mixon went into the trailer and found wine, a purse, and menthol cigarettes. They took the items and called the police. Brandon identified the purse as belonging to Brown. When Mixon gave Brown’s purse to Raley, Raley sent a police officer to Calhoun’s trailer to secure it until they got a search warrant. On cross-examination, Mixon acknowledged that Sketo and Ellenburg told her that the trailer had been broken into and not to go in it, but she did anyway. She stated that Calhoun did not smoke cigarettes and did not have cable television service in his trailer.
Dick Mowbry, former game warden for Geneva County, Alabama, participated in a search for Brown and Brown’s vehicle on December 20, 2010. He found a burnt, white Toyota with no license plate. The entire inside of the car was burnt and while he was looking through the front of the car, he saw a rib cage in the trunk, so he called the police.
Mike Gillis, with the Alabama Bureau of Investigation, responded on December 20 to the call regarding the burnt vehicle. Remains of a body were in the trunk of the car. There was what looked like coaxial cable wrapped around the wrists of the body; duct tape was also found in the car.
On December 21, 2010, Dr. Stephen Boudreau, a medical examiner for Alabama, received the human remains found inside the burnt car. The remains were badly burnt; the hands and lower limbs had been burnt off. Dr. Boudreau was able to identify the remains as female because the uterus and vagina were not destroyed, but the sex organs were denatured, or heated, to such an extent that there was no way to analyze them. He found coaxial cable wrapped around what was left of the remains’ upper arms and tape on the neck. Dr. Boudreau determined that the cause of death was smoke inhalation and thermal burns and that the death was a homicide. He found soot embedded in the airway of the lungs’ mucus blanket and carbon monoxide in the back tissue, meaning that the victim had inhaled smoke. Dental x-rays matched those of Brown’s. On cross-examination, the defense elicited that no foreign DNA was *357 found in Brown’s vagina. Dr. Boudreau also acknowledged that no ends of the coaxial cable were found, and that he could not determine whether Brown was conscious or not when she inhaled the smoke or at what point in time she would have lost consciousness.
On December 20, 2010, Jeffery Lowry, deputy state fire marshal with the Alabama Fire Marshal’s Office, took debris samples from the burnt car and sent them to the Alabama and Florida laboratories. Jason Deese, an arson investigator for the Florida Bureau of Fire and Arson, testified that on December 22, 2010, he inspected the car. The vehicle identification number (VIN) was matched to a 2000 Toyota Avalon. Brown owned a four-door 2000 Toyota Avalon. The fire originated in the driver’s seat and passenger compartment; it was not an engine fire. Perry Kous-siafes, senior crime laboratory analyst for the Florida Fire Marshal’s Office, received six samples from the car on December 30, 2010. The samples from the right front quarter and left quarter of the car tested positive for ignitable liquid.
Trevor Seifret, a crime lab analyst for the Florida Department of Law Enforcement (FDLE), testified that blood found on the cardboard of a roll of duct tape taken from Calhoun’s trailer was a major donor match to Brown and a minor donor partial match to Calhoun. Blood found on blankets taken from Calhoun’s trailer were total matches to Calhoun and Brown. DNA from hair found in Calhoun’s trailer also matched Brown; Seifret testified that DNA is found on hair only when the hair is pulled out of the scalp.
Jennifer Roeder, a digital evidence crime analyst for FDLE, testified that an SD memory card found in Calhoun’s trailer was from Brown’s camera, and based on the time and date stamps of other pictures on the camera, the last picture was taken between 3:30 and 4:00 a.m. on December 17, assuming no one reset the clock on the camera.
On December 20, 2010, Harry Hamilton, captain of the Holmes County Sheriffs Department, seized Calhoun’s trailer pursuant to a search warrant. He noticed that the evidence tape on the door had been broken. He found Calhoun hiding under his mattress in the bed frame in his trailer. Calhoun had scratches on his hands, arms, and neck.
Raley executed a second search of Calhoun’s trailer on December 28 at the impound yard of the Holmes County Sheriffs office after Brown’s remains had been found. He found a TV face down on the mattress of the bed and a DVD player. A VCR was on the floor and the top was off, with wires tangled in the corner. A converter box with outputs for a coaxial cable and a TV with a coaxial coupling were found, but no coaxial cable was found in the trailer.
The State rested, and the defense provided witnesses as follows. José Martinez, owner of the Friendly Mini-Mart, testified that Calhoun came to his store on December 16 and bought a pack of cigars, wine, and apple cider. He never knew Calhoun to buy cigarettes.
Matt Crutchfield who lived near America’s Precious Metals was awakened on December 17 between 1 and 3:30 a.m. by a loud bang. He had heard the noise before and thought it came from the recycling plant. Monica Crutchfield, his wife, was also awakened by a loud noise that came from America’s Precious Metals, but she testified that she had never heard that noise before. Darlene Madden, who lived one block from America’s Precious Metals, awoke to a loud noise that sounded like cars colliding at approximately 2:30 to 3:00 a.m. She testified that she may have heard *358 a second noise but did not get up to investigate it.
John Sketo, Calhoun’s father and co-owner of America’s Precious Metals, testified that Calhoun’s trailer was located beside the scrap yard. Sketo arrived at the scrap yard at approximately 7:30 a.m. on December 17 and noticed that the Bobcat was missing from the place it had been the day before. He also noticed that the door to Calhoun’s trailer was open. Sketo testified that none of this was like that the day before. Ellenburg called the police. El-lenburg and Sketo found the Bobcat by the loading dock, and they thought it had pushed something off of the dock. Tread marks on the ground had not been there the day before. Sketo looked in Calhoun’s trailer and it looked like someone had searched it; drawers were open and things were strewn about. Sketo saw a small grill on Calhoun’s bed, which usually remained outside the trailer. Sketo did not see anyone in the trailer. He did not see a purse on the floor of the trailer. Sketo exited the trailer and left the door open.
Mixon arrived at the junkyard and asked if Sketo had seen Calhoun. Sketo replied that he had not and told Mixon not to go into the trailer because someone had broken into it, but Mixon went into the trailer anyway. Mixon was in the trailer for about one minute. Then Mixon left the junkyard. Sketo went back into the trailer and found Calhoun’s gun leaning against the couch on the floor. Sketo testified that if the gun had been there the first time he went into the trailer he would have noticed it. He stated that the gun was not there before Mixon went into the trailer. On cross-examination, the State elicited from Sketo that he did not see Mixon carry the gun or anything else into the trailer.
Ellenburg testified that he arrived at the junkyard at approximately 7:30 a.m. on December 17. He stated that Calhoun’s door did not have pry marks on it the day before, and Calhoun’s trailer was not in disarray the day before. He did not see a gun in the trailer the first time he looked. He stated that the tire tracks near the loading dock and next to the Bobcat looked like they were made by a dual-wheeled vehicle. A corner of the cement steps was also knocked off, and had not been like that the day before.
Lieutenant Raley searched a barn in Pine Oak Community in Geneva, Alabama, and a license tag bracket matching the description of one on Brown’s car was found at the property. There was also a piece of cardboard that had oil and tire marks on it. Brown’s family told Raley that her car had a small oil leak. However, Raley could not trace the oil stain or the bracket to Brown’s car.
On February 28, 2012, the jury returned a verdict of guilty of first-degree murder and kidnapping.
Penalty Phase
The State moved for admission of all evidence from the guilt phase into the penalty phase and rested.
The defense provided witnesses as follows. Pastor A.J. Lombarin, Cliff Jenkins, and Ryan George, all ministers to Calhoun, each testified that Calhoun was devoted to Christian study and ministered to other inmates while awaiting the instant trial. Patrick O’Dell, an inmate, testified that Calhoun invited him to bible study and was his mentor, teacher, and minister, and changed the course of O’Dell’s life by telling him to take responsibility for his actions. Jerry Pappas, an inmate, testified that Calhoun was like a brother to him and changed his life for the better. Darryl Williams, a former inmate, testified that Calhoun helped him change and encouraged him to witness to others outside of the jail.
*359 Lieutenant Bill Pate, a security officer at the Holmes County jail, testified that Calhoun had no behavioral problems while incarcerated and that his only prior criminal record was driving while his license was suspended and violating probation.
Charlie Skinner, Calhoun’s brother-in-law, testified that Calhoun was generous to a fault and that he had given his life to God. Sharon Calhoun, Calhoun’s mother, testified that Calhoun and his father had a close relationship. Calhoun has a son with whom he is very close and to whom he is a good father. Calhoun also treated Mixon’s son like his own son. Sharon testified that Calhoun was a good student, a boy scout, never got into trouble, and sends preachers to his father to help counsel him.
The jury recommended a sentence of death by a vote of nine to three.
Spencer[1]- Hearing
Betsy Spann, Calhoun’s sister, testified that Calhoun was like her best friend and kept her out of trouble while they were growing up. Sharon Calhoun testified that Calhoun had found God and that Calhoun was innocent. John Searcy, a minister who had gone to counsel Calhoun on the night of the verdict, testified that Calhoun had actually counseled him that night. Following the conclusion of the Spencer hearing, the trial court allowed victim impact statements from Brown’s family members.
The trial court found three aggravators: (1) cold, calculated, and premeditated (CCP) — very great weight; (2) during the commission of a kidnapping — great weight; and (3) for the purpose of avoiding arrest — very great weight. The trial court found one statutory mitigator: no significant history of criminal activity — significant weight, and five nonstatutory miti-gators: (1) good jail conduct pending and during trial — little weight; (2) positive role model to other inmates — some weight; (3) capable of forming loving relationships— little weight; (4) childhood history — little weight; and (5) defendant will be incarcerated for the remainder of his life with no danger to others — minimal weight. The trial court gave the jury recommendation of death great weight. The trial court concluded that the aggravating circumstances far outweighed the mitigating circumstances and sentenced Calhoun to death for the murder of Brown and 100 years of imprisonment for the kidnapping of Brown.
Calhoun appeals, raising the following three issues for this Court’s review: (1) whether the trial court erred in excluding Calhoun’s exculpatory statements to police under the rule of completeness; (2) whether the trial court erred in finding the aggravators of CCP and avoiding arrest; and (3) a Ring[2] claim. We also review the sufficiency of the evidence and proportionality. For the reasons that follow, we affirm Calhoun’s convictions and sentences.
ANALYSIS
I. Rule of Completeness
Calhoun asserts that the trial court abused its discretion in allowing the State to ask Lieutenant Raley about statements Calhoun made to him during an interview without admitting the entire interview under the rule of completeness. Calhoun contends that his statements that (1) he was at the Brooks’ residence on Saturday, December 18, 2010, and (2) Brown had never been to his trailer before, were out of context and, in fairness, the rest of *360 Calhoun’s interview with Raley should have been admitted to provide the context of these statements.
As a general rule of law, self-serving statements are not admissible under section 90.808(18), Florida Statutes (2009). However, section 90.108 provides:
(1) When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him or her at that time to introduce any other part or any other writing or recorded statement that in fairness ought to be considered contemporaneously. An adverse party is not bound by evidence introduced under this section.
§ 90.108(1), Fla. Stat. (2009).
The purpose of this statute, known as the rule of completeness, is to “avoid the potential for creating misleading impressions by taking statements out of context.” Larzelere v. State, 676 So.2d 394, 401 (Fla.1996). “[P]arties may seek the introduction of other statements when those statements ‘in fairness ought to be considered contemporaneously’ with the introduction of the partial statement,” but “[s]uch a fairness determination falls within the discretion of the trial judge.” Id. at 402. Review of this issue is for abuse of discretion. Id.
Kaczmar v. State, 104 So.3d 990, 1000-01 (Fla.2012) (alterations in original).
First, this issue was not properly preserved for appellate review. Calhoun never proffered the specific statements from the interview he sought to admit to the trial court. See 90.104(l)(b), Fla. Stat. (2009) (“A court may predicate error, set aside or reverse a judgment, or grant a new trial on the basis of admitted or excluded evidence when a substantial right of the party is adversely affected and [w]hen the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer of proof or was apparent from the context within which the questions were asked.”); see generally Blackwood v. State, 777 So.2d 399, 410-11 (Fla.2000) (“In order to preserve a claim based on the court’s refusal to admit evidence, the party seeking to admit the evidence must proffer the contents of the excluded evidence to the trial court.” (citing Lucas v. State, 568 So.2d 18, 22 (Fla.1990); Jacobs v. Wainwright, 450 So.2d 200, 201 (Fla.1984))). Thus, Calhoun must demonstrate that the error, if any, was fundamental, which it was not. Fundamental error is “defined as error that reaches down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.” Anderson v. State, 841 So.2d 390, 403 (Fla.2003).
Even if Calhoun had properly preserved this claim, Calhoun would not be entitled to relief. Calhoun contends that the trial court erred in finding that his statements were inadmissible solely on the basis that they were self-serving. See Christopher v. State, 583 So.2d 642, 646 (Fla.1991) (“Once the officer testified in the state’s case-in-chief about one portion of Eberhardt’s statements to him, the court erred in sustaining the state’s hearsay objection for the reason that his statements he was ‘high’ or intoxicated were self serving.”) (quoting Eberhardt v. State, 550 So.2d 102, 105 (Fla. 1st DCA 1989)). We agree. Here, the trial court erred in excluding Calhoun’s statements for the reason that they were self-serving without making a determination based on fairness.
Nonetheless, any error in excluding these statements is harmless beyond a reasonable doubt because there is no reasonable possibility that exclusion of the redacted statements affected the outcome of the jury’s verdict. See State v. DiGuilio, *361 491 So.2d 1129, 1138 (Fla.1986); see also Larzelere, 676 So.2d at 402. The statements with which Calhoun asserts error were only two statements out of the extensive record in this case. Additionally, both statements were cumulative to other information elicited during the trial.
Calhoun’s statement that he was at the Brooks’ residence on December 18 was cumulative to the testimonies of Tiffany and Glenda Brooks, who both testified that Calhoun was in their shed on the morning of December 18. Regarding Calhoun’s statement that Brown had never been to Calhoun’s trailer before, Calhoun contends that he should have been allowed to clarify that the statement meant any time before the night of December 16 and that he did not know if Brown made it to his trailer on December 16. This information that Calhoun contends should have been admitted is cumulative to the testimonies of Glenda and Tiffany Brooks that Calhoun told the Brooks that Brown was probably the girl who was supposed to pick him up. This implies that Calhoun was not at his trailer when Brown arrived the night she was supposed to pick him up. Additionally, during the defense’s case-in-chief, the defense introduced testimony from Sketo and Ellenburg that someone had broken into Calhoun’s trailer the night of December 16. This also implies that someone other than Calhoun was at Calhoun’s trailer when Brown arrived and therefore, Calhoun did not know if Brown arrived at his trailer that night. Thus, the information Calhoun seeks to introduce through the rule of completeness, that he did not know if Brown arrived at his trailer on December 16 and that his statement that Brown had never been to his trailer before December 16, was in fact provided to the jury. Accordingly, any error in not admitting these statements under the rule of completeness is harmless beyond a reasonable doubt.
II. Aggravating Factors
Calhoun asserts that the trial court erred in finding the avoiding arrest and cold, calculated, and premeditated (CCP) aggravators. In reviewing the trial court’s finding of an aggravating circumstance, this Court’s “task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding.” McWatters v. State, 36 So.3d 613, 641 (Fla.2010) (quoting Lynch v. State, 841 So.2d 362, 368 (Fla.2003)). The sentencing order shows that the trial court applied the correct rules of law in making these determinations. Thus, the only question is whether there is competent, substantial evidence in the record to support the findings of avoiding arrest and CCP.
a. Avoiding Arrest
The avoiding arrest aggravator is applicable when “[t]he capital felony was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody.” § 921.141(5)(e), Fla. Stat. (2009). “The avoid arrest aggravator focuses on the motivation for the crimes.” Jennings v. State, 718 So.2d 144, 151 (Fla.1998) (citing Stein v. State, 632 So.2d 1361, 1366 (Fla.1994)).
Where the victim is not a police officer, “the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness,” and “[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator.” However, this factor may be proved by circumstantial evidence from which the motive for the murder may be *362 inferred, without direct evidence of the offender’s thought processes.
In other cases, this Court has found it significant that the victims knew and could identify their killer. While this fact alone is insufficient to prove the avoid arrest aggravator, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.
Buzia v. State, 926 So.2d 1203, 1209-10 (Fla.2006) (some emphasis omitted) (quoting Parker v. State, 873 So.2d 270, 289 (Fla.2004)).
The trial court’s finding of the avoiding arrest aggravator is not supported by competent, substantial evidence in this case. Most of the facts on which the trial court relied in support of finding this aggravator were based on Calhoun’s attempts to avoid arrest after Brown’s death, not on his motive to kill Brown. Very little information exists about what happened between Calhoun and Brown in the events leading up to Brown being put in the trunk of her car and dying from smoke inhalation and thermal burns in the woods. While it is true that Brown was able to identify Calhoun, “this alone is insufficient to support application of this aggravator.” Zack v. State, 753 So.2d 9, 20 (Fla.2000) (citing Consalvo v. State, 697 So.2d 805 (Fla.1996)). Based on the lack of evidence in the record of any motive to kill Brown, the trial court’s finding that Calhoun’s sole or dominant motive for the murder was to avoid arrest is based on speculation. Accordingly, we strike this aggravator.
Nonetheless, we find that the error is harmless beyond a reasonable doubt. See DiGuilio, 491 So.2d at 1138; see also Zack, 753 So.2d at 20. Error in finding an impermissible aggravator can only be harmless beyond a reasonable doubt if there is no reasonable possibility that the evidence presented in mitigation is sufficient to outweigh the remaining ag-gravators. See Hill v. State, 643 So.2d 1071, 1073 (Fla.1994). In addition to the avoiding arrest aggravator, the trial court found CCP, which the trial court gave very great weight, and is considered one of the weightiest aggravators. See Larkins v. State, 739 So.2d 90, 95 (Fla.1999) (noting that CCP is one of “the most serious aggravators set out in the statutory sentencing scheme ... ”). The trial court also found the aggravator of kidnapping, which the trial court gave great weight. The trial court found only one statutory miti-gator of no significant history of criminal activity — significant weight, and five non-statutory mitigators which were allotted minimal, little, and some weight as follows: (1) good jail conduct pending and during trial — little weight, (2) positive role model to other inmates — some weight, (3) capable of forming loving relationships — little weight, (4) childhood history — little weight, and (5) will be incarcerated for the remainder of his life with no danger to others— minimal weight. Considering the remaining aggravators and the limited mitigation in this case, we find that there is no reasonable possibility that the error contributed to the sentence. Accordingly, we find that the error in finding the avoid arrest aggravator is harmless beyond a reasonable doubt.
b. CCP
In order to establish the CCP aggravator, the evidence must show:
that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold); that the defendant *363 had a careful plan or prearranged design to commit murder before the fatal incident (calculated); that the defendant exhibited heightened premeditation (premeditated); and that the defendant had no pretense of moral or legal justification.
Franklin v. State, 965 So.2d 79, 98 (Fla.2007) (citing Jackson v. State, 648 So.2d 85, 89 (Fla.1994)). “ ‘CCP involves a much higher degree of premeditation’ than is required to prove first degree murder.” Deparvine v. State, 995 So.2d 351, 381-82 (Fla.2008) (quoting Foster v. State, 778 So.2d 906, 921 (Fla.2000)).
“The focus of the CCP aggravator centers on the manner in which the defendant executed the crime.” McGirth v. State, 48 So.3d 777, 793 (Fla.2010) (citing Walker v. State, 957 So.2d 560, 581 (Fla. 2007)). While circumstantial evidence can be used to support an aggravating factor, “the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor.” Harris v. State, 843 So.2d 856, 866 (Fla.2003) (quoting Hildwin v. State, 727 So.2d 193, 194 (Fla.1998)). Here, there is competent, substantial evidence to support the trial court’s finding of CCP.
The first prong of the test for CCP is that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage. Here, the deliberate nature of Calhoun’s actions establishes that the murder was not prompted by emotional panic or a fit of rage. Brown had been bound and put in the trunk of her car, driven into the woods in Alabama approximately ten miles from Calhoun’s home and left to die of smoke inhalation and thermal burns after Calhoun doused the car with ignitable fluid and lit it on fire. Based on these facts, this crime was not prompted by emotional frenzy, but rather a product of cool and calm reflection. See generally Wright v. State, 19 So.3d 277, 299 (Fla.2009) (“Wright had ample opportunity during the ten-mile abduction drive to the orange grove to reflect on his actions and abort any intent to kill. Instead, Wright chose to shoot each victim in the head at close range. These actions establish the cold nature of the murders.”) (citation omitted).
Regarding the second prong of CCP — that the defendant had a careful plan or prearranged design to commit murder before the fatal incident — where a defendant arms himself in advance, kills execution-style, and has time to coldly and calmly decide to kill, the element of “calculated” is supported. Wright, 19 So.3d at 299. “Taking a victim to an isolated location or choosing an isolated location to carry out an attack can ... be indicative of a plan or prearranged design to kill.” Franklin, 965 So.2d at 99 (citing Thompson v. State, 648 So.2d 692, 696 (Fla.1994); Wuornos v. State, 644 So.2d 1000, 1008 (Fla.1994)). Here, the last picture on Brown’s camera was taken around 3 a.m. at Calhoun’s residence. Calhoun was then seen in what appears to have been Brown’s car at approximately 6:00 a.m. at a convenience store in Alabama. A large fire in the area in which Brown’s burnt car and her remains were eventually found was not seen until approximately 11 a.m. later that morning. Considering all of these factors, Calhoun’s actions were over a long enough period of time to support a finding that Calhoun coldly and calmly decided to kill Brown. See Wright, 19 So.3d at 299 (finding the calculated element of CCP was met and stating, “The drive to the orange grove afforded Wright time to coldly and calmly make the final plan and decision to kill the victims.”); Knight v. State, 746 So.2d 423, 436 (Fla.1998) (upholding CCP and stating, “Even if Knight did not make the final decision to execute the two vie- *364 tims until sometime during his lengthy journey to his final destination, that journey provided an abundance of time for Knight to coldly and calmly decide to kill.”); Fennie v. State, 648 So.2d 95, 99 (Fla.1994) (“The lengthy and drawn out nature of this crime clearly indicates [the defendant] carefully contemplated his actions prior to the fatal incident.”).
Regarding the third prong — that the defendant exhibited heightened premeditation, this Court has “previously found the heightened premeditation required to sustain this aggravator where a defendant has the opportunity to leave the crime scene and not commit the murder but, instead, commits the murder.” Lynch, 841 So.2d at 373 (quoting Alston v. State, 723 So.2d 148, 162 (Fla.1998)). Here, Brown was bound and placed in the trunk of her car. Calhoun drove her at least ten miles north, across the Florida state line, into the woods of Alabama. Calhoun could have left Brown bound in the trunk, but instead, he doused the car with an ignitable fluid and set the car on fire. See Wright, 19 So.3d at 300 (“Wright had ample opportunity, from the time he encountered the victims in the supermarket parking lot to when he stopped the car in the orange grove, to release the victims and leave the crime scene without committing two murders.”); see also Fennie, 648 So.2d at 99 (“The lengthy nature of the crime also goes to the heightened premeditation necessary to establish this aggravating factor”).
Finally, it is clear that the fourth element — that the murder was committed with no pretext of legal or moral justification — was satisfied. The record is devoid of any evidence of a threatening act by Brown prior to the murder that would constitute a pretext of legal or moral justification. See generally Hertz v. State, 803 So.2d 629, 651 (Fla.2001) (“As to Hertz, there is no construction of the facts that would support even a fragmentary claim of excuse or justification, or of a defense to homicide, because the victims here were bound and helpless when killed.”) (citing Walls v. State, 641 So.2d 381, 388 (Fla. 1994)).
“While CCP may be established by circumstantial evidence, this Court will consider any reasonable hypothesis of innocence offered by the defense that might be inconsistent with and negate this aggravating factor.” Wright, 19 So.3d at 300 (citing Gordon v. State, 704 So.2d 107, 114 (Fla.1997)). Calhoun contends that because Brown could have already been unconscious before he put her in the trunk, he could have thought he was burning a dead body rather than killing Brown when he drove her to the woods and set the car on fire. For support, Calhoun notes that the trial court found that the State did not establish the especially heinous, atrocious, or cruel (HAC) aggravator because it was unclear whether Brown was already unconscious by the time she was put in the trunk and burned.
As the State contends, however, if Calhoun thought that Brown was already dead before being put in the trunk of her car, it would be unnecessary for him to bind her arms and apply duct tape around her neck as Calhoun did. As testified to by the medical examiner, although he could not determine at what point Brown became unconscious, Brown was still breathing when the car was burned, as evidenced by smoke found in her lungs. Based on these facts, the evidence is inconsistent with this hypothesis that might negate the aggravating factor.
Additionally, Calhoun’s contention that the trial court’s rejection of HAC necessarily negates a finding of CCP is incorrect. Different elements must be satisfied for each aggravator. Compare Barnhill v. *365 State, 834 So.2d 836, 849-50 (Fla.2002) (“HAC Acuses on the means and manner in which the death is inflicted and the immediate circumstances surrounding the death, rather than the intent and motivation of a defendant, where a victim experiences the torturous anxiety and fear of impending death.”), with McGirth, 48 So.3d at 793 (“The focus of the CCP ag-gravator centers on the manner in which the defendant executed the crime.”); see also Oyola v. State, 99 So.3d 431, 443 (Fla.2012) (“In evaluating whether HAC is present, a trial court focuses on the victim’s perception of the circumstances — not the perpetrator’s viewpoint.”) (emphasis in original). Thus, rejection of the proposed HAC aggravator does not necessarily negate a finding of CCP.
Based on the above, there is competent, substantial evidence to support the trial court’s finding of CCP.
III. Ring
Calhoun asserts that Florida’s death penalty statute violates the United States Supreme Court decision in Ring. “[W]e have repeatedly rejected constitutional challenges to Florida’s death penalty under Ring.” Ault v. State, 53 So.3d 175, 206 (Fla.2010) (citing Jones v. State, 845 So.2d 55, 74 (Fla.2003); Bottoson v. Moore, 833 So.2d 693 (Fla.2002); King v. Moore, 831 So.2d 143 (Fla.2002)). We decline to revisit our decisions in Bottoson and King on this issue. Also, because the jury found Calhoun guilty of kidnapping, it found the facts supported the trial court’s application of the “during the course of a kidnapping” aggravator, which satisfies the requirements of Ring. See, e.g., Salazar v. State, 991 So.2d 364, 378 (Fla.2008) (“Also, because the jury found Salazar guilty of burglary and attempted murder, it found the facts supporting the trial court’s application of the ‘during the course of a felony aggravator.”); Johnson v. State, 969 So.2d 938, 961 (Fla.2007) (“Second, Johnson is not entitled to relief under Ring because the ‘murder in the course of a felony ag-gravator’ rests on the separate convictions of kidnapping and sexual battery, which satisfies Sixth Amendment requirements”.).
IV. Sufficiency of the Evidence
Although not raised by Calhoun, “this Court has a mandatory obligation to independently review the sufficiency of the evidence in every case in which a sentence of death has been imposed.” Miller v. State, 42 So.3d 204, 227 (Fla.2010); Jones v. State, 963 So.2d 180, 184 (Fla.2007). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Miller, 42 So.3d at 227 (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)).
“Where a conviction is based wholly upon circumstantial evidence, a special standard of review applies.” McDuffie v. State, 970 So.2d 312, 330 (Fla.2007) (quoting Darling v. State, 808 So.2d 145, 155 (Fla.2002)).
Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt, a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence. The question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, we will not reverse.
Reynolds v. State, 934 So.2d 1128, 1145-46 (Fla.2006) (quoting Darling, 808 So.2d at 155).
*366 [This Court’s] view of the evidence must be taken in the light most favorable to the state. The state is not required to rebut conclusively every possible variation of events which could be inferred from the evidence, but only to introduce competent evidence which is inconsistent with the defendant’s theory of events. Once that threshold burden is met, it becomes the jury’s duty to determine whether the evidence is sufficient to exclude every reasonable hypothesis of innocence beyond a reasonable doubt.
McDuffie, 970 So.2d at 330 (quoting Orme v. State, 677 So.2d 258, 262 (Fla.1996)).
The jury in this case was instructed on both premeditated murder and felony-murder. Because the guilty verdict was rendered on a general form, the evidence must support either premeditated murder or felony-murder. Dessaure v. State, 891 So.2d 455, 472 (Fla.2004).
Premeditation is defined as more than a mere intent to kill; it is a “fully formed conscious purpose to kill.” Evans v. State, 838 So.2d 1090, 1095 (Fla.2002) (quoting Woods v. State, 733 So.2d 980, 985 (Fla.1999)). “This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.” Bradley v. State, 787 So.2d 732, 738 (Fla.2001) (quoting Woods, 733 So.2d at 985). Premeditation may be inferred from such facts as “the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted.” Id. (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)). “Leaving a wounded, living victim trapped in a burning vehicle is sufficient evidence from which to infer premeditation.” Kocaker v. State, 119 So.3d 1214, 1226 (Fla.), cert. denied, -U.S. -, 133 S.Ct. 2743, 186 L.Ed.2d 200 (2013).
There is sufficient evidence to support Calhoun’s conviction for first-degree murder. Harvey Glenn Bush saw Calhoun ask Brown for a ride on December 16, 2010, and Brown responded that she would pick him up after work. Brown drove a 2000 white, four-door Toyota Avalon. Brown drove up to Jerry Gammons’ trailer in a light colored, four-door ear and knocked on his door at about 8:40 p.m. on December 16, and asked for Calhoun. Calhoun’s trailer was located approximately one road from Gammons’ trailer.
Brown’s purse was found in Calhoun’s trailer. Blood found on a roll of duct tape in Calhoun’s trailer was a major donor match to Brown’s DNA and a minor donor partial match to Calhoun’s DNA. Blood found on blankets taken from Calhoun’s trailer matched Calhoun and Brown. DNA from hair that had been pulled out of the scalp and found in Calhoun’s trailer also matched Brown.
Calhoun came into the convenience store in which Sherry Bradley worked in the early morning of December 17. Bradley noticed scratches and dried blood on Calhoun’s hands. Calhoun had on a white shirt that had spots of blood on it and his fingernails had black underneath them. Calhoun was driving a white, four-door car with a Florida license plate.
Witnesses noticed smoke from the highway in Geneva, Alabama, on December 17, at approximately 11 a.m. Dick Mowbry found a burnt white Toyota with no license plate on December 20. The VIN on the car was matched to a 2000 Toyota Avalon. Samples from the right front quarter and left quarter of the car tested positive for ignitable liquid. The entire inside of the *367 car was burnt and Brown’s remains were found in the trunk. The hands and lower limbs had been burnt off. Dr. Stephen Boudreau, the medical examiner, determined that the cause of death was smoke inhalation and thermal burns and that the death was a homicide.
Tiffany Brooks found Calhoun in her family’s shed on December 18, on the ground wrapped in sleeping bags. Investigator Raley went to the site of Brown’s car on December 20. Raley noted that the car was near Coleman Road approximately 1,488 feet from Calhoun’s campsite. The Brooks’ residence was approximately 1.5 miles from Brown’s car.
Based on the above, there is sufficient evidence to support the finding of first-degree murder.
Additionally, we find that there is sufficient evidence to support a finding of felony-murder. Calhoun was convicted of kidnapping pursuant to section 787.01(l)(a)2., Florida Statutes (2009).
(l)(a) The term “kidnapping” means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against her or his will and without lawful authority, with intent to:
2. Commit or facilitate commission of any felony.
There is sufficient evidence to support the conviction of kidnapping. As stated above, witnesses placed Brown as having been last seen headed toward Calhoun’s trailer on the night of December 16 and witnesses heard Brown tell Calhoun she would pick him up that night. Her blood and hair were found in his trailer. Brown’s remains were found in the trunk of her car in the woods in Alabama with coaxial cable wrapped around what remained of her upper arms and duck tape around her neck. The medical examiner testified that smoke and carbon dioxide were found in her lung tissue, indicating that Brown was alive while she was bound in the trunk of the car and the car was lit on fire. As provided above, the medical examiner testified that Brown died as a result of smoke inhalation and thermal burns, and that the death was a homicide. Therefore, there is sufficient evidence to support the conviction of kidnapping with intent to facilitate the commission of the felony of murder.
The hypothesis of innocence that Calhoun was not at his trailer when Brown arrived to pick him up on the night of December 16 and someone else broke into Calhoun’s trailer and killed Brown is negated by the evidence presented by the State. Specifically, Calhoun’s blood was found on items in his trailer that also contained Brown’s blood. Sherry Bradley saw Calhoun driving a car that matched the description of Brown’s car in the early morning of December 17. When Bradley asked Calhoun how he got scratches and blood on him, Calhoun responded that he had been deer hunting. The theory that someone broke into Calhoun’s trailer was negated by Brittany Mixon’s testimony that she and Calhoun lost the key to his trailer months before and had to pry the door open each time they used the door. The theory that Mixon framed Calhoun for the murder by planting evidence in his trailer is negated by the testimonies of other witnesses who watched her each time Mixon went into Calhoun’s trailer on December 17. The witnesses testified that Mixon never brought anything into Calhoun’s trailer and only stayed inside about one minute each time she went inside the trailer. Thus, the evidence was inconsistent with Calhoun’s hypothesis of innocence that another individual committed the murder.
In light of the foregoing, we find that the evidence sufficiently established each *368 element of premeditated first-degree murder and felony-murder.
Proportionality
“[T]o ensure uniformity in death penalty proceedings, ‘we make a comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Floyd v. State, 913 So.2d 564, 578 (Fla.2005) (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). We have described our “proportionality review” as involving “a thoughtful, deliberate proportionality review to consider the totality of circumstances in a case, and to compare it with other capital cases.” Tillman v. State, 591 So.2d 167, 169 (Fla.1991) (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990) (emphasis omitted)). “This entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ In other words, proportionality review ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Offord v. State, 959 So.2d 187, 191 (Fla.2007) (citations and emphasis omitted).
As discussed above, we have stricken the trial court’s finding of the avoiding arrest aggravator. The trial court appropriately found two aggravators: (1) cold, calculated, and premeditated (very great weight), and (2) during the commission of a kidnapping (great weight). The trial court also gave the jury recommendation of death by a vote of nine to three great weight. The trial court found one statutory mitigator: no significant history of criminal activity (significant weight), and five nonstatutory mitigators: (1) good jail conduct pending and during trial (little weight), (2) positive role model to other inmates (some weight), (3) capable of forming loving relationships (little weight), (4) childhood history (little weight), and (5) will be incarcerated for the remainder of his life with no danger to others (minimal weight).
The death sentence is proportional in this case. See Hayes v. State, 581 So.2d 121, 127 (Fla.1991) (affirming death sentence where evidence established two aggravating circumstances of CCP, and commission during a robbery and pecuniary gain merged as one, one statutory miti-gator of age, and nonstatutory mitigators of low intelligence, learning disabled, and deprived background); see generally Foster, 778 So.2d at 920-22 (finding the death penalty proportional where the trial court found two aggravators, avoid arrest and CCP, both accorded great weight, no statutory mitigators and twenty-three nonstat-utory mitigators, assigned very little to no weight); Sliney v. State, 699 So.2d 662, 671-72 (Fla.1997) (finding death penalty proportional with two aggravating circumstances, commission during a robbery and avoid arrest, two statutory mitigators, age and lack of criminal history, and several nonstatutory mitigators, good prisoner, politeness, good neighbor, caring person, good school record, gainful employment).
CONCLUSION
Based on the foregoing, we affirm Calhoun’s convictions of kidnapping and first-degree murder and his respective sentences of 100 years of imprisonment and death.
It is so ordered.
PARIENTE, QUINCE, LABARGA, and PERRY, JJ., concur.
POLSTON, C.J., and CANADY, J„ concur in result.
LEWIS, J., concurs in part and dissents in part, with an opinion.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).